**BEFORE THE UNITED STATES JUDICIAL PANEL ON<br>MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: ACCELLION, INC. DATA BREACH LITIGATION | MDL No. _____ |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF GRACE BEYER'S MOTION FOR TRANSFER AND CENTRALIZATION PURSUANT TO 28 U.S.C. § 1407**

Pursuant to 28 U.S.C. § 1407 and JPML Rule 6.2, Plaintiff Grace Beyer, who filed *Beyer v. Accellion, Inc. et al.*, No. 5:21-cv-02239 (N.D. Cal.), through her counsel Ahdoot & Wolfson, PC ("AW"),[1] respectfully moves the Judicial Panel on Multidistrict Litigation for an Order transferring fourteen (14) currently-filed cases listed in the Schedule of Actions filed concurrently herewith (collectively, the "Actions"), as well as any tag-along cases subsequently filed, to the United States District Court for the Northern District of California for coordinated or consolidated proceedings before the Honorable Edward J. Davila, before whom 8 of 14 Actions are pending.

### INTRODUCTION AND COMMON FACTUAL BACKGROUND

All of the cases subject to this Motion arise from one nucleus of operative facts: a massive data breach suffered by Accellion, Inc. ("Accellion"). Accellion is a Palo Alto-based software company that provides third-party file transfer services to clients. Accellion makes and sells a file transfer service product called the File Transfer Appliance ("FTA"), which is at the heart of this litigation and the source of the breach. Accellion's FTA is a 20-year-old, obsolete, "legacy

---

[1] Ahdoot & Wolfson, PC also represents Jaramey Stobbe in the *Stobbe* action, and Ricky Cochran and Alain Berrebi in the *Cochran* action, with its co-counsel in those actions.

product" that was "nearing end-of-life" at the time of the Data Breach, thus leaving it vulnerable to compromise and security incidents, including the breach involved in all of the Actions.

On December 23, 2020, Accellion disclosed to numerous of its clients ("Impacted Accellion Clients") that criminals breached the data that those clients submitted to Accellion via a vulnerability in its transfer application software. As a result, the sensitive personal information of individuals whom the Impacted Accellion Clients' service—grocery and pharmacy employees and shoppers, law firm clients, students and faculty, and state benefits applicants, among others (collectively, "End Users")—was accessed by unauthorized individuals. The End User Plaintiffs in the Actions (which are listed separately on the Schedule of Actions submitted herewith) allege that Accellion and/or the Impacted Accellion Clients failed to protect their sensitive information, including but not limited to names, email addresses, phone numbers, home addresses, dates of birth, Social Security numbers (SSN), financial information, health and prescription information, and other personally identifiable information (collectively, "PII").

It has been reported that the criminals responsible for the Data Breach exploited numerous vulnerabilities in Accellion's software to steal sensitive data files associated with hundreds of Accellion's clients, including corporations, law firms, banks, universities, and other entities. Numerous entities that are clients of Accellion have already reported being impacted by the Data Breach, including, among others, The Kroger Co.; Flagstar Bank; Qualys; the Office of the Washington State Auditor; the law firms Goodwin Proctor and Jones Day; the University of Colorado; Australia's financial regulator, the Australia Securities and Investments Commission; the Reserve Bank of New Zealand; ABS Group; and Danaher (the "Impacted Accellion Clients").

The criminals—who, according to varying reports, are associated with the well-known Clop ransomware gang, the FIN11 threat group, and potentially other threat actors—launched the

attacks on Accellion and its clients in mid-December 2020, which continued on from at least mid-December 2020 and into January 2021, as these actors continued to exploit vulnerabilities in Accellion's platform. Following the attacks, the criminals resorted to extortion, threatening Accellion's clients that stolen information will be made publicly available unless ransoms are paid.

Each of the Actions is a putative class action, and each is filed on behalf of classes of End User individuals who were employees, customers, clients, or otherwise associated or affiliated with—and provided PII to—the Impacted Accellion Clients. This information, which was transferred and came into possession of Accellion, was then exposed to criminals during the Data Breach. Based on the same nucleus of facts, each Action alleges a common failure by Accellion and/or Impacted Accellion Clients to protect PII resulting in the Data Breach. Each Action alleges substantially similar damages and asserts largely similar counts. All Actions are in their infancy and no answers or responses to the complaints have been filed in any of the Actions.

Based on the numerous common questions of fact and law involved in the Actions, there is a compelling need to establish uniform and consistent standards in conducting pretrial discovery and motion practice, and to avoid potentially inconsistent rulings, inefficiencies, and waste of the parties' and judicial resources that would result if the Actions were allowed to proceed in numerous district courts. This Panel has previously recognized that centralization was proper where, like here, there are multiple defendants entwined in a large data breach. *See In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, 410 F. Supp. 3d 1350, 1353 (J.P.M.L. 2019) (ordering transfer and centralization, recognizing that "a single, multi-defendant MDL" "is necessary to ensure the just and efficient conduct of this litigation.").

The most logical and convenient location for these proceedings is the Northern District of California, where Accellion is headquartered, Accellion's servers and systems are located, and the

majority of the cases are pending. Plaintiff Grace Beyer respectfully requests coordinated proceedings there.

## I. BACKGROUND

This motion for transfer involves fourteen (14) actions pending in three (3) different federal district courts. As this filing, there are nine (9) actions pending in the Northern District of California, three (3) actions pending in the Southern District of Ohio, and two (2) actions pending in the Eastern District of Michigan.[2]

Before filing this motion, undersigned counsel inquired of all plaintiffs' counsel who filed actions against Kroger in the Southern District of Ohio and Flagstar Bank in the Eastern District of Michigan, to determine whether they would be amenable to voluntary transfer under 28 U.S.C. § 1404 to the Northern District of California to avoid the necessity of JPML proceedings. One of those attorneys responded that efforts to coordinate within those Districts for separate Kroger and Flagstar Bank litigations were already ongoing, and that plaintiffs' counsel in those actions would likely prefer to separately litigate the Kroger actions in the Southern District of Ohio and the Flagstar Bank actions in the Eastern District of Michigan, but indicated that counsel would follow up on the issue. While the undesigned counsel will continue to meet and confer with all parties, as of this filing, there is no consensus to voluntarily transfer the Ohio and Michigan federal court actions to the Northern District of California.

Based on the scope of the Data Breach, the number of potential Impacted Accellion Clients, the potential that the End Users Class consists of many thousands if not millions of individuals,

---

[2] Currently, there are two (2) active cases pending in Washington state court relating to Washington State Auditor breach that occurred as a result of the Accellion breach. Those cases must proceed in state court, but it is efficient to transfer and centralize the Actions nonetheless. Counsel for Plaintiffs in the Actions can coordinate with the firms leading the efforts in Washington state court.

and the extensive press coverage, undersigned counsel anticipates that additional class actions will soon be filed in other federal courts alleging similar claims on behalf of similar classes.

### A. Plaintiffs

All plaintiffs in the pending Actions have filed class actions arising from Accellion's disclosure of Data Breach and alleged data privacy failures of Accellion and Impacted Accellion Clients. The Actions are being pursued on behalf of all persons whose PII was compromised in the Data Breach.

Each of the pending Actions presents a common core of facts, in that each case (i) alleges that the PII of many potential class members was stolen during the Data Breach; (ii) asserts injury and damages arising from Data Breach; and (iii) alleges the same or similar misconduct by Accellion and Impacted Accellion Clients. Indeed, the factual allegations in each Complaint are similar in all material respects.

### B. Defendants

Accellion, Inc. is a software company that provides third-party file transfer services to clients, and it makes and sells a file transfer service product called the File Transfer Appliance (FTA). Accellion's FTA is a 20-year-old, obsolete, "legacy product" that, by its own admission, was "nearing end-of-life" at the time of the Data Breach. The FTA was vulnerable to compromise and security incidents, as acknowledged by Accellion, including to its own clients. Due to vulnerabilities in Accellion's FTA software, unauthorized persons were able to exploit the security issues and gain access to Accellion's clients' files, resulting in the Data Breach. Accellion maintains its headquarters at 1804 Embarcadero Road, Suite 200, Palo Alto, CA 94303, which is located in the Northern District of California.

The Kroger Company is an Ohio corporation with its corporate headquarters located at 1014 Vine Street, Cincinnati, Ohio 45202. Numerous of the Actions allege that Kroger was an Accellion client that used the FTA product, and as a result it was impacted by the Data Breach, exposing the PII of employees and customers.

Flagstar Bank is a Michigan corporation with its corporate headquarters located at 5151 Corporate Drive, Troy, Michigan 48098. As with Kroger, numerous of the Actions allege that Flagstar Bank was an Accellion client that used the FTA product, and as a result it was impacted by the Data Breach, exposing the PII of its customers.

### C. Status of the Actions

The pending Actions were all filed during the weeks and months after Accellion announced the Data Breach. Undersigned counsel expects that given the magnitude of the Data Breach, additional similar actions will be filed. Given the infancy of all fourteen (14) of these cases, none of the plaintiffs have been permitted to conduct discovery or to move matters toward trial. As such, a transfer and centralization would not be unduly prejudicial or inefficient. These Actions are in the earliest procedural stage—no answer or other substantive response has been filed in any Action. Accordingly, it is a convenient time to centralize the Actions.

## II. ARGUMENT

Each of the Actions name Accellion, Inc. as the sole or primary defendant. Some of the Actions name The Kroger Co. and Flagstar Bank as additional or sole defendants. The Actions contain similar causes of action, including claims for negligence, violations of consumer protection and privacy statutes, third party beneficiaries to contracts, and invasion of privacy, among others.

The Actions all involve common issues of fact and a common Data Breach, such that centralization will promote the convenience of the parties and witnesses and the just and efficient

conduct of the litigation. *See* 28 U.S.C. § 1407. Transfer and centralization will mitigate the possibility of inconsistent rulings, including rulings regarding class certification, and will promote judicial economy by providing a single forum to which future tag-along actions can be transferred.

    A.    **The Actions and any Tag-Along Actions Are Appropriate for Transfer and Centralization Under 28 U.S.C. § 1407(a)**

Transfer and centralization under 28 U.S.C. § 1407 is authorized if multiple civil actions pending in different districts "involv[e] one or more common questions of fact" and the JPML determines that transfer will further the "convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). "The objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." MANUAL FOR COMPLEX LITIGATION, § 20.131 (4th ed. 2004); *see also Royster v. Food Lion (In re Food Lion)*, 73 F.3d 528, 531-32 (4th Cir. 1996) ("The multidistrict litigation statute . . . was enacted as a means of conserving judicial resources in situations where multiple cases involving common questions of fact were filed in different districts."); *Illinois Mun. Ret. Fund v. Citigroup, Inc.*, 391 F.3d 844, 852 (7th Cir. 2004) (two critical goals of Section 1407 are to promote efficiency and consistency). The statute "was [also] meant to 'assure uniform and expeditious treatment in the pretrial procedures in multidistrict litigation[,]'" and "[w]ithout it, 'conflicting pretrial discovery demands for documents and witnesses' might 'disrupt the functions of the Federal courts.'" *In re Phenylpropanolamine Prod. Liab. Litig.*, 460 F.3d 1217, 1230 (9th Cir. 2006) (quoting H.R. Rep. No. 1130, 90th Cong., 2d Sess. 1 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1898, 1899)). The alternative to transfer is "'multiplied delay, confusion, conflict, inordinate expense and inefficiency.'" *Id.* (quoting *In re Plumbing Fixture Cases*, 298

7

F. Supp. 484, 495 (J.P.M.L. 1968)). Transfer and centralization for pretrial proceedings would achieve these objectives.

        **1.**    **The Actions Involve Common, Numerous, and Complex Questions of Fact**

The first element of the Section 1407 transfer analysis is whether there are one or more common questions of fact. *See* 28 U.S.C. § 1407. The statute, however, does not require a "complete identity or even [a] majority" of common questions of fact to justify transfer. *In re Zyprexa Prods. Liab. Litig.*, 314 F. Supp. 2d 1380, 1381 (J.P.M.L. 2004).

The cases here share a common core of operative factual allegations. The Actions are based upon virtually identical facts and allegations concerning identical conduct by a common actor - Accellion. The factual questions common to all Actions are numerous and complex, and include (without limitation):

- Whether Accellion's FTA software was vulnerable to attack;

- Whether Defendants owed duties to class members to safeguard their PII;

- Whether Defendants failed to comply with those duties;

- Whether End User PII was compromised in the Data Breach;

- Whether Accellion knew that its "legacy" FTA was vulnerable, yet decided to continue to support the software with Impacted Accellion Clients;

- Whether Impacted Accellion Clients, like Kroger and Flagstar Bank, were aware of the security vulnerabilities with FTA, yet continued to use that product, exposing End User PII to criminals;

- Whether Plaintiffs and class members suffered legally cognizable damages as a result of the Data Breach and, if so, in what amount; and

- Whether Plaintiffs and class members are entitled to injunctive relief.

In addition, all Actions rely upon similar legal theories of recovery, each turning on the failure of Accellion, Kroger, Flagstar Bank, and other Impacted Accellion Clients to prevent the

Data Breach. As the Panel has previously stated, "the presence of additional or differing legal theories is not significant when the actions still arise from a common factual core . . . ." *See In re Oxycontin Antitrust Litig.*, 542 F. Supp. 2d 1359, 1360 (J.P.M.L. 2008); *In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1380 (J.P.M.L. 2013) (ordering transfer under Section 1407, finding "common questions of fact and aggregation in some matter will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation."). Because numerous common issues of fact exist among these Actions, the pending actions clearly satisfy the first element of the transfer analysis under Section 1407.

### 2. Section 1407 Transfer and Centralization Will Further the Convenience of the Parties and Witnesses.

Resolution of these common issues in a single forum would further the convenience of all parties and witnesses. *See* 28 U.S.C. § 1407(a). Because all Actions involve similar allegations and factual questions, the plaintiffs in the Actions will require discovery of the same documents and depositions of the same witnesses. Accellion and its co-defendants likely will raise the same discovery objections and seek the same protective orders or privileges in each case. Absent centralization and transfer, all parties will be subjected to duplicative discovery, and witnesses will face multiple, redundant depositions. *See, e.g.*, *In re Uber Techs., Inc., Data Sec. Breach Litig.*, 304 F. Supp. 3d 1351, 1353 (J.P.M.L. 2018) ("Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification; and conserve the resources of the parties, their counsel, and the judiciary."); *In re Pilot Flying J Fuel Rebate Contract Litig.*, 11 F. Supp. 3d 1351, 1352 (J.P.M.L. 2014) ("Centralization will avoid repetitive depositions of [the defendant's] officers and employees and duplicative document discovery regarding the alleged scheme"); *In re Uranium Indus. Antitrust Litig.*, 458 F. Supp. 1223, 1230 (J.P.M.L. 1978) ("[Plaintiffs] will have to depose many of the same witnesses, examine

9

many of the same documents, and make many similar pretrial motions in order to prove their . . . allegations. The benefits of having a single judge supervise this pretrial activity are obvious.").

Absent transfer, the federal court system will be forced to administer — and Accellion (and any Impacted Accellion Clients that are co-defendants) will be compelled to defend — at least fourteen (14) related actions across multiple venues, all proceeding on potentially different pretrial schedules and subject to different judicial decision-making and local procedural requirements. Moreover, each plaintiff will be required to monitor and possibly participate in each of the other similar actions to ensure that Accellion and co-defendants do not provide inconsistent or misleading information. Many of the same pretrial disputes are likely to arise in each action. Likewise, due to the similar causes of action in each complaint, the defenses asserted in the Actions will be substantially the same, as will the substance of any motions to dismiss and motions for summary judgment, which will be based on the same claims and based on the same arguments in each Action.

None of the pending cases have progressed to the point where efficiencies will be forfeited through transfer to an MDL proceeding—each Action is in its infancy. This Panel has routinely recognized that consolidating litigation in one court benefits *both* plaintiffs and defendants. For example, pretrial transfer would reduce discovery delays and costs for plaintiffs, and permit plaintiffs' counsel to coordinate their efforts and share the pretrial workload. *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,* 173 F. Supp. 2d 1377, 1379 (2001) ("And it is most logical to assume that prudent counsel will combine their forces and apportion their workload in order to streamline the efforts of the parties and witnesses, their counsel and the judiciary, thereby effectuating an overall savings of cost and a minimum of inconvenience to all concerned."); *In re Baldwin-United Corp. Litigation,* 581 F. Supp. 739, 741 (J.P.M.L. 1984)

(same). As for the defendants, expert depositions will be coordinated, document production will be centralized, and travel for current and former employees will be minimized, since they will only have to appear in one location rather than multiple districts around the country.

While undersigned counsel anticipates there will be additional case filings, the current level of litigation—14 cases in three separate District Courts—would benefit from transfer and coordinated proceedings, given the allegations of these complaints. *In re: Equifax, Inc., Customer Data Sec. Breach Litig.*, 289 F. Supp. 3d 1322, 1324 (J.P.M.L. 2017) (finding that "centralization under Section 1407 . . . will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."); *see also In re First Nat'l Collection Bureau, Inc., Tel. Consumer Prof. Act (TCPA) Litig.*, 11 F. Supp. 3d 1353, 1354 (J.P.M.L. 2014) ("[E]fficiencies can be gained from having these actions proceed in a single district," such as "eliminat[ing] duplicative discovery; prevent[ing] inconsistent pretrial rulings . . . and conserv[ing] the resources of the parties, their counsel and the judiciary."); *In re: Zurn Pex Plumbing Products Liability Litig.*, 572 F. Supp. 2d 1380, 1381 (J.P.M.L. 2008) (granting transfer and consolidation of three cases and six potential tag-alongs because of the "overlapping and, often, nearly identical factual allegations that will likely require duplicative discovery and motion practice.").

Transfer also will reduce the burden on the parties by allowing more efficient and centralized divisions of workload among the attorneys already involved in this litigation, as well as those who join later. Plaintiffs themselves will reap efficiencies from being able to divide up the management and conduct of the litigation as part of a unified MDL process through a Plaintiffs' Co-Lead Counsel team or similar mechanism, instead of each plaintiff's counsel separately litigating its own cases on distinct and parallel tracks. *In re Marriott Int'l, Inc.,*

*Customer Data Sec. Breach Litig.,* 363 F. Supp. 3d 1372, 1374 (J.P.M.L. 2019) ("Centralization will . . . conserve the resources of the parties, their counsel, and the judiciary.").

In sum, transfer of these actions would serve the convenience of the parties and eliminate duplicative discovery, saving the parties and the courts significant time, effort, and money.

### 3. Transfer and Centralization Will Promote the Just and Efficient Conduct of These Actions

Centralization is necessary to prevent inconsistent pretrial rulings on many central issues, which would present significant problems due to the substantial consistency in factual and legal allegations among all Actions. *Id.* (Observing that centralization would "prevent inconsistent pretrial rulings on class certification and other issues"). The prospect of inconsistent rulings also encourages forum and judge shopping (including, for example, manipulation of non-congruent discovery limits, approaches to electronically stored information, and protective order issues). By contrast, a single MDL judge coordinating pretrial discovery and ruling on pretrial motions in all of these federal cases at once will help reduce witness inconvenience, the cumulative burden on the courts, and the litigation's overall expense, as well as minimizing this potential for conflicting rulings. *Id.*

Centralization will mitigate these problems by enabling a single judge to manage discovery and the parties to coordinate their efforts. *In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, 410 F. Supp. 3d at 1353 ("[A] single MDL encompassing [multiple defendants] is necessary to ensure the just and efficient conduct of this litigation."). This will reduce litigation costs and minimize inconvenience to the parties and witnesses, to the benefit of litigants, third parties, and the courts. *See id.* at 1354 ("centralization will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation."); *In re Enfamil Lipil Mktg. and Sales Practices Litig.*, 764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011) ("Centralizing the

actions will allow for the efficient resolution of common issues and prevent unnecessary or duplicative pretrial burdens from being placed on the common parties and witnesses."); *In re: Lumber Liquidators Chinese-Manufactured Flooring Products Mktg., Sales Practices and Products Liability Litig.*, 109 F. Supp. 3d at 1383 ("Centralization will . . . conserve the resources of the parties, their counsel and the judiciary.").

Centralizing these Actions under Section 1407 will ensure streamlined resolution of this litigation to the overall benefit of the parties and the judiciary. Accordingly, transfer to a single district court is appropriate for the just and efficient resolution of these cases.

### B. The Northern District of California Is an Appropriate Transferee Forum,

Counsel respectfully submits that the Northern District of California is the superior forum for the centralized actions, and Judge Edward J. Davila is the ideal transferee judge.

In choosing an appropriate transferee forum, this Panel considers: (1) where the largest number of cases is pending; (2) where discovery has occurred; (3) where cases have progressed furthest; (4) the site of the occurrence of the common facts; (5) where the cost and inconvenience will be minimized; and (6) the experience, skill, and caseloads of available judges. MANUAL FOR COMPLEX LITIGATION, § 20.132 (4th ed. 2004). While several of these criteria are not yet implicated due to the infancy of the Actions, the Northern District of California presents the most appropriate forum for the transfer and centralization of these actions.

The first factor heavily favors the Northern District of California because the largest number of cases are pending in that District. Nine of the 14 pending Actions have been filed in the Northern District of California.

The second and third factors are not relevant here because discovery has not yet occurred in any case, and no defendants have answered or otherwise responded to the complaint in any

Action.

The fourth and fifth factors heavily favor the Northern District of California because Accellion is headquartered in Palo Alto, California, which is located in the Northern District of California. The most important witnesses and evidence will be located at Accellion's headquarters or elsewhere in the Northern District of California. Accellion is the primary and common defendant in this matter and it was Accellion's FTA product that is allegedly at the heart of the data security incident in this case. Accellion's computers, servers, and systems, including those relating to its services and the FTA software at the heart of the breach, are located in the Northern District of California. Accellion's data security and information technology personnel, and individuals with knowledge about Accellion's FTA software, are based at the company's headquarters or in nearby surrounding areas. This includes, for example, Accellion's Chairman and Chief Executive Office[3] and Chief Product Officer,[4] and other data security and IT personnel.

Large data breaches where numerous actions are filed in multiple districts are transferred and centralized under Section 1407 basically as a matter of course. And in the vast majority of prior data breach MDLs, the Panel transferred the cases to the district of the defendant's headquarters because the relevant documents, witnesses, and/or breached servers were likely to be located there. For example:

1. *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 363 F. Supp. 3d 1372, 1374–75 (J.P.M.L. 2019) (transferring to D. Md. because, e.g., "Marriott is headquartered in that district, and relevant documents and witnesses thus likely will be found there.");

2. *In re Capital One Customer Data Sec. Breach Litig.*, 396 F. Supp. 3d 1364, 1365 (J.P.M.L. 2019) (transferring to E.D. Va. because, e.g., "Capital One is headquartered within this district . . . and . . . relevant documents and witnesses will be found there.");

---

[3] https://www.linkedin.com/in/jonathan-yaron-81a12a3/ (Jonathan Yaron—San Francisco).

[4] https://www.linkedin.com/in/yarongalant/ (Yaron Galant—Palo Alto).

3. *In re: Equifax, Inc., Customer Data Sec. Breach Litig.*, 289 F. Supp. 3d 1322, 1326 (J.P.M.L. 2017) (transferring to N.D. Ga. because, e.g., "Equifax is headquartered in that district, and relevant documents and witnesses thus likely will be found there.");

4. *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 223 F. Supp. 3d 1353, 1354–55 (J.P.M.L. Dec. 7, 2016) (transferring to N.D. Cal. because, e.g., "Yahoo's corporate headquarters is located within the district, and therefore relevant documents and witnesses are likely to be located there.");

5. *In re: Sprouts Farmers Mkt., Inc., Employee Data Sec. Breach Litig.*, 232 F. Supp. 3d 1348 (J.P.M.L. Oct. 6, 2016) (transferring to D. Ariz. because, e.g., "Sprouts is headquartered in this district, and the witnesses and documents relevant to the facts of this litigation are located there.");

6. *In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 214 F. Supp. 3d 1357, 1358 (J.P.M.L. Oct. 6, 2016) (transferring to M.D. Fla. because, e.g., "21st Century is headquartered in this district, and the witnesses and documents relevant to the facts of this litigation are located there.");

7. *In re Medical Informatics Engineering, Inc., Customer Data Sec. Breach Litig.*, 148 F. Supp. 3d 1381, 1382 (J.P.M.L. Dec. 10, 2015) (transferring to N.D. Ind. because, e.g., "The center of gravity of this litigation is located in the Northern District of Indiana, where MIE . . . is headquartered and operates . . . . Relevant documents and witnesses thus are likely located within or near the district.");

8. *In re: U.S. Office of Personnel Management Data Security Breach Litig.*, MDL No. 2664, 2015 WL 6391150, at *2 (J.P.M.L. Oct. 19, 2015) (transferring cases to D.D.C. because, e.g., the "federal government defendants are located in that district, and [defendant] KeyPoint has an office in nearby Fairfax, Virginia. Relevant documents and witnesses thus likely will be found there.");

9. *In re: Supervalu, Inc., Customer Data Sec. Breach Litig.*, MDL No. 2586, 2014 WL 7263354, at *1 (J.P.M.L. Dec. 16, 2014) (transferring to D. Minn. because, e.g., "Supervalu's corporate headquarters is located within the district, and therefore relevant documents and witnesses are likely to be located there.");

10. *In re: Home Depot, Inc. Customer Data Sec. Breach Litig.*, MDL No. 2583, 2014 WL 7006970, at *2 (J.P.M.L. Dec. 11, 2014) (transferring to N.D. Ga. because, e.g., "Home Depot is headquartered in the Northern District of Georgia. Thus, relevant documents and witnesses are likely located within the district.");

11. *In re: Target Corp. Customer Data Sec. Breach Litig.*, 11 F. Supp. 3d 1338, 1339 (J.P.M.L. Apr. 2, 2014) (transferring to D. Minn. because, e.g., "Target is headquartered in that district . . . .");

12. *In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1381 (J.P.M.L. Oct. 18, 2013) (transferring to E.D. Mo. because, e.g., "Schnucks has its headquarters in this district, where the impacted servers and likely relevant witnesses and other evidence will be found.");

13. *In re: Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 867 F. Supp. 2d 1357, 1358 (J.P.M.L. June 13, 2012) (transferring to D. Nev. because, e.g., "Zappos is based in Hendersonville, Nevada. According to the chief information technology officer of Zappos, personnel who responded to the data breach are located in this district, as are the servers from which customer data was obtained, in addition to other potentially relevant documents and witnesses.");

14. *In re: RBS Worldpay, Inc., Customer Data Sec. Breach Litig.*, 626 F. Supp. 2d 1322 (J.P.M.L. June 9, 2009) (transferring to N.D. Ga. because, e.g., "RBSW is headquartered in Atlanta [and] a significant amount of discovery is likely to take place in that district.");

15. *In re: Lending Tree, LLC, Customer Data Sec. Breach Litig.*, 581 F. Supp. 2d 1367, 1368 (J.P.M.L. Oct. 7, 2008) (transferring to W.D.N.C. because, e.g., "LendingTree is headquartered in Charlotte, North Carolina, and parties, witnesses and documents may be found there.");

16. *In re: Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 559 F. Supp. 2d 1405, 1406 (J.P.M.L. June 9, 2008) (transferring to D. Me. because, e.g., "Hannaford has its headquarters in that district, and thus relevant documents and witnesses may be found there."); and

17. *In re: TJX Companies, Inc., Customer Data Sec. Breach Litig.*, 493 F. Supp. 2d 1382, 1383 (J.P.M.L. June 28, 2007) (transferring to D. Mass. because, e.g., "TJX is headquartered in Massachusetts and documents and witnesses will likely be found there.").

Furthermore, the Panel has noted that the Northern District of California is a convenient location for MDL proceedings. *See, e.g., In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 223 F. Supp. 3d at 1355 (("parties agree that [the Northern District of California] will serve the convenience of the parties and witnesses."); *In re: Roundup Prod. Liab. Litig.*, 214 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016) ("We select the Northern District of California as the appropriate transferee district for this litigation. Two of the earliest-filed and most procedurally advanced actions are pending in this district. The Northern District of California is both convenient and easily accessible for all parties . . . .").

16

Also, due to the sheer size of the population of California, a large number of the class members in the pending Actions likely reside in California. The Northern District of California will be the dominant site with the most relevant evidence, witnesses, parties, and a large number of class members.

### C. Judge Davila is the Most Appropriate Transferee Judge

The sixth MCL factor favors transfer to the Northern District of California, specifically to the Honorable Edward J. Davila. This Panel has recognized that the Northern District of California has the resources and ability to manage multi-district litigation such as this one. *See, e.g., In re: Roundup Prod. Liab. Litig.*, 214 F. Supp. 3d at 1348 ("[W]e are convinced that the district has the necessary judicial resources and expertise to efficiently manage this litigation.").

Furthermore, eight of the nine cases pending in the Northern District of California are before Judge Davila. Judge Davila is an experienced, capable and well-respected jurist. Judge Davila recently issued final approval of the settlement in, *In re: Apple Inc. Device Performance Litigation*, MDL No. 2827, and has no other MDL before him. Judge Davila was also assigned the first-and second-filed cases. These factors support that Judge Davila is the appropriate transferee judge.

The totality of circumstances supports transfer and centralization in the Northern District of California, before Judge Davila.

### III. CONCLUSION

For the foregoing reasons, plaintiff Beyer respectfully request that her motion be granted and that the Panel transfer the Actions listed in the attached Schedule of Actions, as well as any future tag-along actions, to the Northern District of California before the Honorable Edward J. Davila, for consolidated or coordinated pretrial proceedings under 28 U.S.C. § 1407.

Dated: March 31, 2021

Respectfully submitted,

 */s/ Tina Wolfson*
TINA WOLFSON (SBN 174806)
*twolfson@ahdootwolfson.com*
ROBERT AHDOOT (SBN 172098)
*rahdoot@ahdootwolfson.com*
THEODORE MAYA (SBN 223242)
*tmaya@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone:  310.474.9111
Facsimile:  310.474.8585

ANDREW W. FERICH
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone:  310.474.9111
Facsimile:  310.474.8585

*Attorneys for Plaintiff Grace Beyer*