**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: ACCELLION DATA BREACH LITIGATION** | **MDL No. 3002** |

**DEFENDANT ACCELLION, INC.'S RESPONSE IN
SUPPORT OF THE MOTION FOR TRANSFER AND
CENTRALIZATION PURSUANT TO 28 U.S.C. § 1407**

Pursuant to Rule 6.1(c) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Defendant Accellion, Inc. ("Accellion") respectfully responds in support of Plaintiff Grace Beyer's motion for transfer and consolidation of all identified related actions to the Northern District of California for coordinated pretrial proceedings (the "Motion").

**I.     INTRODUCTION**

Accellion supports the transfer and consolidation of cases arising from the December 2020 and January 2021 criminal attacks on customers that used Accellion's file transfer appliance software ("FTA") (the "Security Incident") to the Northern District of California. Each of the actions arises from a core set of common facts and involves claims that are likely to implicate similar facts and argument, and *every* defendant in the cases filed in Indiana, Michigan, and Ohio is *also* named in at least one case in the Northern District of California based on the same Security Incident. Further, the putative classes in *every* case pending in Michigan and Ohio are completely subsumed by the proposed classes in several cases pending in California. Allowing these matters to proceed in four different districts in four different states is not only inefficient, it creates significant risk of inconsistent results, including on the critical issue of class certification.

To date, 21 cases have been filed in federal courts relating to the Security Incident—including the 14 cases identified in the Motion, as well as seven others filed since the Motion was submitted. This includes cases filed against Accellion as a sole defendant, against Accellion and one of two FTA customers (The Kroger Co. ("Kroger") and Flagstar Bancorp, Inc. ("Flagstar")) together as co-defendants, and against Flagstar or Kroger as sole defendants. But regardless of the named defendants, *all* of these actions arise out of the same Security Incident and involve the same knowledgeable parties: indeed, the cases that only name Accellion still include allegations regarding particular FTA customers (typically Kroger or Flagstar), and the cases that only name Flagstar or Kroger include allegations regarding Accellion as well. There is little doubt that plaintiffs who only named an FTA customer as a defendant will still seek discovery from Accellion regarding the Security Incident and the FTA software that is exclusively in Accellion's possession. Further, 18 of the 21 actions involve Kroger and/or Flagstar (including eight of the 11 cases pending in the Northern District of California), so those customers will likewise be critical sources of non-party discovery in nearly every matter. Regardless of whether plaintiffs chose to name Accellion only, Kroger or Flagstar only, or both, the relevant facts and discovery sought from these parties in each case will be substantially the same.

In light of the common facts, parties, and claims across all of the actions, this is precisely the sort of situation for which 28 U.S.C. § 1407 was designed. This Panel faced similar issues when deciding to create a single MDL to address a data breach involving one medical billing company and the various laboratories that worked with that company. *See In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, 410 F. Supp. 3d 1350 (J.P.M.L. 2019). Though there were some discovery issues specific to each laboratory defendant, the Panel recognized that, absent transfer and consolidation, there would be an enormous amount of unnecessary duplication, a needless diversion of judicial resources, and increased burdens on party and third-

party witnesses required to testify in multiple proceedings around the country, if the cases were to proceed that far. And were the cases allowed to remain before different judges, there would be a serious risk of inconsistent and conflicting rulings, including on the critical issue of class certification. These considerations readily support consolidation under Section 1407.

Accellion likewise agrees that the Honorable Edward J. Davila in the Northern District of California is the appropriate transferee judge. Judge Davila is already presiding over more than half of the cases filed to date (including the first-filed action), Accellion is located within the District, and Kroger and Flagstar—the only defendants named in actions outside the Northern District of California—are also already named in multiple actions already pending before Judge Davila.

## II.    FACTUAL BACKGROUND

### A.    Background

The 21 cases at issue here were all filed against Accellion and its customers by plaintiffs who allege their personal information was exposed when criminal actors targeted certain FTA customers' systems.[1] The plaintiffs purport to represent classes including customers, employees, applicants, or others whose personal information was transferred or stored by Accellion custom-

---

[1]    The cases are: *Brown v. Accellion, Inc.*, No. 5:21-cv-01155 (N.D. Cal.); *Zebelman v. Accellion, Inc.*, No. 5:21-cv-01203 (N.D. Cal.); *Rodriguez v. Accellion, Inc.*, No. 5:21-cv-01272 (N.D. Cal.); *Stobbe v. Accellion, Inc.*, No. 5:21-cv-01353 (N.D. Cal.); *Price v. Accellion, Inc.*, No. 5:21-cv-01430 (N.D. Cal.); *Bolton v. Accellion, Inc.*, No. 3:21-cv-01645 (N.D. Cal.); *Whitaker v. Accellion, Inc.*, No. 5:21-cv-01708; *Sharp v. Accellion, Inc.*, No. 3:21-cv-02525 (N.D. Cal.); *Cochran v. The Kroger Co. and Accellion, Inc.*, No. 5:21-cv-01887 (N.D. Cal.); *Beyer v. Accellion Inc. and Flagstar Bancorp, Inc.*, No. 5:21-cv-02239; *Pollard v. Accellion, Inc. and Flagstar Bancorp, Inc.*, No. 5:21-cv-02572 (N.D. Cal.); *Jones v. The Kroger Co.*, No. 1:21-cv-00146 (S.D. Ohio); *Govaert v. The Kroger Co.*, No. 1:21-cv-00174 (S.D. Ohio); *Doty v. The Kroger Co.*, No. 1:21-cv-00198 (S.D. Ohio); *Abrams v. The Kroger Co.*, No. 1:21-cv-00198 (S.D. Ohio); *Buck v. The Kroger Co.*, No. 1:21-cv-00279 (S.D. Ohio); *Martin v. The Kroger Co. and Accellion, Inc.*, No. 5:21-cv-00717 (S.D. Ind.); *Angus v. Flagstar Bank FSC*, No. 2:21-cv-10657 (E.D. Mich.); *Garcia v. Flagstar Bank FSC*, No. 2:21-cv-10671; and *Burdick v. Flagstar Bank, FSB*, No. 2:21-cv-10786 (E.D. Mich.).

ers who were attacked in the Security Incident, including Kroger, Flagstar, and others. Each of the complaints alleges that unauthorized third parties exploited vulnerabilities in the FTA software to gain access to data stored in or transferred by certain customers' FTA systems.

FTA is a software product that Accellion licensed to customers on a subscription basis for their own use in securely transferring files.  The FTA software is not offered as a service: Accellion does not manage customers' FTA configuration, permission rights, or security keys, nor does Accellion access any content stored on customers' FTA instances. Rather, customers choose the data that is stored and transferred on their own FTA instances, and that data flows without any action on the part of Accellion or any flow of data through Accellion systems.

Separate and apart from licensing the FTA software, Accellion provides customers with different options for hosting instances of the software and the data they transfer using it: a customer can host the software and data on (1) their own systems ("on-premises"), (2) cloud storage arranged by the customer, or (3) cloud storage space within Amazon Web Services ("AWS") arranged by Accellion. Even for FTA instances of customers who choose Accellion-arranged hosting with AWS, however, Accellion's customers are responsible for managing their respective instances of the software, and Accellion never accesses the contents of the customers' files.

In its investigation of the Security Incident, Accellion confirmed that criminals attacked a subset of Accellion's FTA customers in two different exploits—one that was discovered and promptly addressed by Accellion in December 2020, and another that was discovered and promptly addressed by Accellion in January 2021.[2] The exploits involved sophisticated zero-day

---

[2]    Details regarding the nature and timeline of the attacks, as well as Accellion's development and release of FTA software patches that fully addressed the vulnerabilities, are available in a report published by Mandiant, an independent third-party cybersecurity company that Accellion engaged to investigate the Security Incident in February 2021. *See* Mandiant FireEye Report: Accellion, Inc. File Transfer Appliance (FTA) Security Assessment, dated March 1, 2021

(*i.e.*, previously unknown) vulnerabilities in the FTA software which enabled the attackers to obtain unauthorized access to (and in some cases download) data stored in certain FTA customer instances.

**B.      Status of the Pending Cases**

As of this filing, 20 putative class actions and one individual action are pending against Accellion, Kroger, and Flagstar in four federal district courts. *See* Schedule of Actions. Eleven of these cases are currently pending in the Northern District of California, including cases that name Accellion as a sole defendant, and others that name Accellion and Kroger or Accellion and Flagstar as co-defendants. In addition, six actions are pending against Kroger in the Southern District of Ohio, a seventh action against Kroger and Accellion is pending in the Southern District of Indiana, and three actions are pending against Flagstar in the Eastern District of Michigan—all filed by individuals whose data was allegedly compromised as a result of the Security Incident.

Each of the putative class actions seeks certification of one or more nationwide classes, several also seek to certify state subclasses, and all of the proposed class definitions substantially overlap or subsume each other. Examples of competing class definitions include:

- "All individuals in the United States whose PII was exposed to unauthorized third parties as a result of the compromise of Accellion FTA on or around December 20, 2020[.]" *Zebelman v. Accellion*, 5:21-cv-01203 (N.D. Cal.), Dkt. No. 1 ¶ 72.

- "All persons in the United States whose PII was stolen in the Data Breach of Accellion's FTA in December 2020 and January 2021." *Price v. Accellion, Inc.*, 21-cv-01430 (N.D. Cal.), Dkt. No. 1 ¶ 51.

- "All residents of the United States whose PII was compromised in the data breach involving Accellion's FTA product that occurred throughout December 2020 and Janu-

---

(footnote continued)

(available at <u>https://www.accellion.com/sites/default/files/trust-center/accellion-fta-attack-mandiant-report-full.pdf</u>).

ary 2021" (nationwide class), "[a]ll residents of Missouri whose PII was compromised in the data breach involving Accellion's FTA product that occurred throughout December 2020 and January 2021" (Missouri subclass), and "[a]ll individuals whose PII was entrusted to Flagstar and was compromised in the data breach of Flagstar's operations via Accellion's FTA product that occurred between December 2020 and January 2021" (Flagstar subclass). *Pollard v. Accellion, Inc. and Flagstar Bancorp, Inc.*, 5:21-cv-02572 (N.D. Cal.), Dkt. No. 1 ¶ 30.

- "All residents of the United States whose Personally Identifiable Information was compromised as a result of the Data Breach disclosed by the Washington State Auditor in January 2021." *Brown v. Accellion, Inc.*, 5:21-cv-01155 (N.D. Cal.), Dkt. No. 1 ¶ 38.

- "All Kroger employees, pharmacy customers, Little Clinic patients, money services customers, and other Kroger customers whose private information was entrusted to Kroger and was compromised in the December 2020 data breach." *Jones v. The Kroger Co.*, 21-cv-00146 (S.D. Ohio), Dkt. No. 1 ¶ 90.

- "All residents in the United States whose Personal Information was compromised in the Accellion Data Breach occurring in December 2020 and January 2021" (nationwide class); "[a]ll residents of California whose Personal Information was compromised in the Accellion Data Breach occurring in December 2020 and January 2021" (California class); "[a]ll residents of California whose Medical Information was compromised in the Accellion Data Breach occurring in December 2020 and January 2021" (California Medical Information class); and "[a]ll residents of Georgia whose Personal Information was compromised in the Accellion Data Breach occurring in December 2020 and January 2021" (Georgia class). *Cochran v. The Kroger Company et al.*, 5:21-cv-01887 (N.D. Cal.), Dkt. No. 1 ¶ 74.

All of these cases are in the very earliest stages of litigation—and all were filed in the last three months, including nine in just the past month alone. *See* Schedule of Actions. No defendant has filed an answer or otherwise responded to any of the complaints—nor will they soon. In addition to the Motion before the Panel, Beyer has also filed a Rule 42(a) Motion to Consolidate the actions, which is currently pending in the Northern District of California, and the parties in those actions have entered a stipulation extending Accellion's time to respond to the complaints until after the issues of transfer and consolidation are decided.

## III.   THE PANEL SHOULD TRANSFER THE CASES TO A SINGLE DISTRICT FOR COORDINATED PRETRIAL PROCEEDINGS

Coordination for pretrial purposes is appropriate where "civil actions involving one or more common questions of fact are pending in different districts[.]" 28 U.S.C. § 1407(a). The Panel orders transfers if doing so "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." *Id.* Transfer under "Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer, and the presence of additional facts is not significant where the actions arise from a common factual core." *In re Am. Med. Collection Agency*, 410 F. Supp. 3d at 1354–55; *see also In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 710 F. Supp. 2d 1378, 1380 (J.P.M.L. 2010) (transfer under Section 1407 "does not require . . . a majority of common factual or legal issues"). Moreover, the Panel has repeatedly recognized the propriety of centralization where putative class actions with overlapping proposed classes are simultaneously pending in multiple judicial districts, creating the risk of conflicting decisions on the class issue. *See, e.g.*, *In re HSBC Bank USA, N.A., Debit Card Overdraft Fee Litig.*, 949 F. Supp. 2d 1358, 1359 (J.P.M.L. 2013) (centralization of two actions "will … prevent inconsistent pretrial rulings, including with respect to class certification"); *In re Foot Locker, Inc.*, 787 F. Supp. 2d 1364, 1365 (J.P.M.L. 2011) (centralization of four actions "will have the benefit of . . . preventing inconsistent pretrial rulings, including with respect to class certification").

Accellion supports consolidation of the related cases here. While the factual and legal issues are not identical across the 21 pending cases—for example, cases involving different FTA customers will involve different facts concerning the timeline of the attack and nature and extent of alleged data loss—each case involves a core set of overlapping facts, parties, and claims that would be most efficiently addressed in a consolidated proceeding. The alternative, litigating these cases separately in disparate districts, would require duplicative discovery from Accellion and each of customer in multiple forums, risk inconsistent results (including on class issues), and

7

result in precisely the sort of unnecessary duplication of effort and waste of resources that the MDL statute is designed to prevent. As the Panel recently concluded in resolving competing MDL petitions involving a data breach where multiple defendants were named in different districts:

> In our judgment, a single MDL encompassing Quest, LabCorp, Bio-Reference, and potentially other laboratories is necessary to ensure the just and efficient conduct of this litigation. In many situations, we are hesitant to bring together actions involving competing defendants, but when, as here, the actions stem from the same data breach, and there is significant overlap in the central factual issues, parties, proposed classes, and claims, we find that creation of a single MDL is warranted . . . Although the advocates of separate MDLs have identified certain laboratory-specific issues, Section 1407 does not require a complete identity of common factual issues or parties as a prerequisite to transfer, and the presence of additional facts is not significant where the actions arise from a common factual core. We are confident that the transferee judge can accommodate any issues involving the different laboratories in a manner that ensures the just and efficient resolution of all cases

*In re Am. Med. Collection Agency*, 410 F. Supp. 3d at 1353–54.  For similar reasons, the Panel should order that the actions before it be consolidated and transferred to the Northern District of California under Section 1407. *See, e.g.*, *In re Farxiga (Dapagliflozin) Prods. Liab. Litig.*, 273 F. Supp. 3d 1380, 1382 (J.P.M.L. 2017) (transfer appropriate where it would "eliminate duplicative discovery, prevent inconsistent rulings on *Daubert* and other pretrial matters, and conserve the resources of the parties, their counsel, and the judiciary").

### A.     The Actions "Involve One or More Common Questions of Fact"

The cases here involve a number of common, core questions of fact, the vast majority of which will be in the exclusive possession of Accellion, Kroger, or Flagstar. Accellion is likely to face extensive discovery demands in *all* cases—whether named as a defendant or not—regarding the FTA software licensed to Accellion's customers, FTA security features, the nature of the Security Incident and the zero-day vulnerabilities targeted by the attacker, and the efforts of FTA customers to migrate to Accellion's newer file-sharing product, Kiteworks. Likewise, 18 of the

21 cases have been filed by customers and/or employees of either Kroger or Flagstar. Again, whether each customer is named or not, the factual and legal issues in the cases will still substantially overlap—such as Kroger and Flagstar's acquisition of customer data, their operation of the FTA software, when these customers were targeted by the attackers, what data was exposed, and what was communicated to Kroger's and Flagstar's customers about the incident

The majority of the legal issues will likewise overlap across the cases and turn on these same common facts. Given the nature of the tort claims at issue—and the common putative classes of Kroger and Flagstar customers who are split on pursuing claims against Accellion, Kroger and Flagstar, or both—the conduct and culpability of *all* defendants will be at issue across the cases, even in cases where a defendant is not formally named. The overlap of issues involving Accellion and its FTA software across all cases, and overlapping customer issues involving Flagstar or Kroger in the vast majority of cases, readily satisfies the requirements of Section 1407. *See In re Am. Med. Collection Agency*, 410 F. Supp. 3d at 1353 (coordination is appropriate where there is an "overlap in the central factual issues, parties, proposed classes, and claims"); *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 201 F. Supp. 3d 1375, 1378 ("Section 1407 does not require a complete identity of factual issues or parties as a prerequisite to transfer").

Accordingly, the actions involve "common questions of fact" within the meaning of 28 U.S.C. § 1407. *See, e.g.*, *AT&T Mobility Wireless*, 710 F. Supp. 2d at 1380 (ordering consolidation of 29 consumer actions against AT&T where "[d]iscovery . . . will undoubtedly overlap and many of the legal issues will turn on similar facts and law"); *see also In re Air West, Inc. Sec. Litig.*, 384 F. Supp. 609, 611 (J.P.M.L. 1974) ("Indeed, when two or more complaints assert comparable allegations against identical defendants based upon similar transactions and events, common factual questions are presumed." (citations omitted)).

9

**B.      Transfer and Consolidation Would Promote Efficiency and Minimize the Potential for Duplicative Discovery**

Transfer and consolidation of these actions would also promote efficiency and minimize the potential for duplicative discovery. *See, e.g.*, *In re Foundry Resins*, 342 F. Supp. 2d 1346, 1347 (J.P.M.L. 2004). Accellion will be required to provide substantially overlapping discovery across all of the cases, whether Accellion is a named defendant or a third party. It is not realistic to claim that Accellion's discovery burdens will be meaningfully lower in the cases outside of California in which it has not been formally named, since each of those cases arise out of the same Security Incident and contain numerous allegations concerning Accellion and the FTA software. This is particularly true for the single action pending in the Southern District of Indiana, which was recently amended to name Accellion directly as a defendant (along with Kroger).

The same is true for Flagstar and Kroger, who are either named or are primary targets for third-party discovery in 18 of the 21 cases across four districts. While certain plaintiffs have filed suit against Kroger and Flagstar as single defendants in Ohio and Michigan, respectively, efforts to obtain discovery will not be similarly constrained to those cases. Both customers are also named as defendants in several actions filed in the Northern District of California, and Kroger and Flagstar will be subject to third-party discovery in cases filed against Accellion in California involving putative classes that include Kroger or Flagstar customers and employees. Each of Accellion, Flagstar, and Kroger will need to provide extensive discovery across the actions, and it would make little sense to require their representatives to appear at numerous duplicative depositions across multiple cases, or to require the parties to continually make the same substantial production of documents in response to redundant requests in separate cases. *See, e.g.*, *In re Am. Med. Collection Agency*, 410 F. Supp. 3d at 1353 (concluding that "a single MDL encompassing breached medical billing company and various medical laboratories impacted by its data breach] [wa]s necessary to ensure the just and efficient conduct of th[e] litigation"); *In re Auto Body*

10

*Shop Antitrust Litig.*, MDL No. 2557, 2014 WL 3908000, at *1 (J.P.M.L. Aug. 8, 2014) (transfer before a single judge was beneficial to "structure pretrial proceedings to accommodate all parties' legitimate discovery needs while ensuring that common witnesses are not subjected to duplicative discovery demands"); *In re Enfamil Lipil Mktg. & Sales Practices Litig.*, 764 F. Supp. 2d 1356, 1357 (J.P.M.L. 2011) ("Centralizing the actions will allow for the efficient resolution of common issues and prevent unnecessary or duplicative pretrial burdens from being placed on the common parties and witnesses."). In addition, these actions are also likely to involve complicated technical issues regarding the coding and security and the nature of the vulnerabilities exploited, resulting in complex expert reports and potentially *Daubert* hearings, all of which could be more efficiently handled in a consolidated proceeding. *See, e.g.*, *In re Natrol, Inc. Glucosa-mine/Chondroitin Mktg. & Sales Practices Litig.*, MDL No. 2528, 2014 WL 2616783, at *1 (J.P.M.L. Jun. 10, 2014).

Further, even as to customer-specific issues that may differ across cases involving different FTA customers, the parties will benefit from a centralized plan from a single judge to address any individualized discovery needed across the actions. *See In re Kugel Mesh Hernia Patch Prods. Liab. Litig.*, 493 F. Supp. 2d 1371, 1373 (J.P.M.L. 2007) (transfer and consolidation will permit a single judge to "formulate a pretrial program that . . . allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues"); *see also AT&T Mobility Wireless*, 710 F. Supp. 2d at 1380 (presence of non-common issues does not preclude consolidation where "centralization will save considerable judicial time and will prevent the likelihood of inconsistent rulings" and transferee judge "can easily deal with the difficulties inherent to centralization"). While the facts developed in relation to each FTA customer will differ, the *nature* of discovery sought will be similar and could be readily managed by a single MDL judge.

11

Consolidation will ensure that the actions are supervised by a single judge and discovery magistrate who, from day-to-day contact with all aspects of the litigation, will be in the best position to design a pretrial program to prevent duplicative discovery. *See, e.g.*, *In re Yamaha Motor Corp. Rhino ATV Prods. Liab. Litig.*, 597 F. Supp. 2d 1377, 1378–79 (J.P.M.L. 2009) (finding consolidation appropriate in order to minimize duplicative discovery regarding allegations of vehicle defects, even when numerous non-class cases also posed individualized factual questions); *see also In re Pineapple Antitrust Litig.*, 342 F. Supp. 2d 1348, 1349 (J.P.M.L. 2004); *In re Advanced Inv. Mgmt., L.P., Pension Fund Mgmt. Litig.*, 254 F. Supp. 2d 1377, 1379 (J.P.M.L. 2003). And while proceeding in separate actions would be burdensome to Accellion and other defendants, no parties or their counsel would suffer prejudice as a result of transfer and consolidation. All of the cases are in the early stages, no defendant has answered or otherwise responded to any of the complaints, discovery has not commenced in any matter, and all defendants are already parties to one or more cases pending in the proposed transfer district. A coordinated discovery schedule is likely to benefit plaintiffs as well, as defendants would not be bogged down with countless overlapping but potentially inconsistent demands (*e.g.*, negotiating a dozen or more different sets of search terms and making different productions in response or scheduling multiple days of depositions for the same witness). Overall, transfer and consolidation would benefit all parties.

### C.   Transfer and Consolidation Would Minimize the Risk of Inconsistent Pretrial Decisions, Including Inconsistent Class Certification Decisions

Finally, consolidation would substantially lower the likelihood that there will be inconsistent pretrial decisions across the actions, including inconsistent discovery rulings and conflicting decisions on class certification. As the Panel has recognized, "[c]entralization will enable the transferee judge to make consistent rulings on such discovery disputes from a global vantage point" and will otherwise prevent inconsistent pretrial rulings on common factual issues. *See In*

12

re *Yamaha Motor Corp*, 597 F. Supp. 2d at 1378–79; *see also In re Dow Chem. Co. Sarabond Prods. Liab. Litig.*, 650 F. Supp. 187, 188 (J.P.M.L. 1986).

Perhaps most critically, consolidation will prevent inconsistent pretrial rulings with respect to questions of standing and class certification. *See, e.g.*, *In re H&R Block Mortg. Corp. Prescreening Litig.*, 435 F. Supp. 2d 1347, 1349 (J.P.M.L. 2006) ("The three actions contain competing class allegations and involve facts of sufficient intricacy that could spawn challenging procedural questions and pose the risk of inconsistent and/or conflicting judgments."). The Panel has long recognized that preventing inconsistent class decisions "presents one of the strongest reasons for" transfer and consolidation. *In re Plumbing Fixtures*, 308 F. Supp. 243, 244 (J.P.M.L. 1970); *see also In re Toys "R" Us-Del., Inc., Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 581 F. Supp. 2d 1377 (J.P.M.L. 2008) (consolidating two putative class actions that were "brought on behalf of nearly identical putative nationwide classes"); *In re Sugar Indus.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975) ("We have consistently held that transfer of actions under Section 1407 is appropriate, if not necessary, where the possibility of inconsistent class determinations exists" (citations omitted)). The risk of inconsistent class decisions is particularly sharp here, where virtually all of the proposed class definitions across the 19 putative class actions overlap in some fashion, and the putative classes in the cases naming Accellion in California subsume every one of the proposed classes in the Ohio and Michigan cases against Kroger and Flagstar. For example:

- Several plaintiffs purport to bring claims on behalf of every individual nationwide who had any personal information compromised, regardless of which Accellion customer was attacked. *See, e.g.*, *Rodriguez v. Accellion, Inc.*, No. 5:21-cv-01272 (N.D. Cal.); *Stobbe v. Accellion, Inc.*, No. 5:21-cv-01353 (N.D. Cal.); *Price v. Accellion, Inc.*, No. 5:21-cv-01430 (N.D. Cal.); *Whitaker v. Accellion, Inc.*, No. 5:21-cv-01708 (N.D. Cal.).

- Other plaintiffs offer subclasses for individuals who had personal health information compromised, again without regard to the customer involved. *See, e.g.*, *Bolton v. Ac-*

*cellion, Inc.*, No. 3:21-cv-01645 (N.D. Cal.); *Cochran v. The Kroger Co., et al.*, 5:21-cv-01887 (N.D. Cal.).

- Still others limit their classes to individuals who were affected by a particular customer incident, such as Kroger, Flagstar, or the WSAO, but these putative class members would be subsumed by the "all customer" classes described above (including every proposed class in the Ohio and Michigan cases). *See, e.g.*, *Brown v. Accellion, Inc.*, No. 5:21-cv-01155 (N.D. Cal.) (WSAO); *Pollard v. Accellion, Inc. et al.*, No. 5:21-cv-02572 (N.D. Cal.) (Flagstar); *Angus v. Flagstar Bank FSC,* No. 21-cv-10657 (E.D. Mich.) (Flagstar); *Jones v. The Kroger Co.*, No. 21-cv-00146 (S.D. Ohio) (Kroger).

- Other plaintiffs name state subclasses, all of which are subsumed by the definitions above. *See, e.g.*, *Garcia v. Flagstar Bank, FSB*, No. 21-cv-10671 (E.D. Mich.) (New Jersey subclass); *Angus v. Flagstar Bank FSC*, No. 21-cv-10657 (E.D. Mich.) (Florida subclass); *Cochran v. The Kroger Co., et al.*, No. 5:21-cv-01887 (N.D. Cal.) (California and Georgia subclasses).

It is crucial that a single judge weigh these competing class definitions and apply the requirements of Rule 23 across the actions in a consistent manner.

Finally, transfer and consolidation under Section 1407 is the most efficient and effective way to achieve minimization of duplicative discovery and inconsistent pretrial rulings. While Beyer has separately moved to consolidate the cases currently pending in the Northern District of California under Fed. R. Civ. P. 42(a), that motion is not only being opposed, but consolidation would result in few discovery efficiencies for Accellion and other defendants—who would be required to provide the same evidence in the consolidated California cases and separately in Ohio, Michigan, and Indiana—and leaves significant risk that different judges will reach different results on wholly common class certification issues. Nor does it make sense to require the parties to move to transfer the ten cases pending outside of California individually under Section

1404—an inefficient practice that is precisely what transfer under Section 1407 is designed to avoid.[3]

## IV.   THE PANEL SHOULD CONSOLIDATE THE ACTIONS IN THE NORTHERN DISTRICT OF CALIFORNIA

Accellion agrees that the Panel should transfer the consolidated actions to Judge Davila in the Northern District of California, the judge before whom 11 of the related actions, including the first-filed action, are currently pending.

It bears clarification that Beyer is incorrect to speculate that "breached servers" and evidence relating to the relevant FTA servers "at the heart of the breach" will be located at Accellion's headquarters in Palo Alto, California. Motion at 14. To the extent servers were breached, they are varied and specific to the customers that were attacked: as detailed above, Accellion licenses its software to customers who executed transfers and stored data on their own servers or in Amazon Web Services for their own use. Accellion does not maintain "FTA servers" on behalf of its customers, and customer data is not transferred through any Accellion systems or servers.  That said, it is correct that Accellion witnesses and documents generally are located in California, and there is little doubt that all of the plaintiffs will seek testimony and documents from Accellion.

---

[3]     While Accellion has supported efforts to coordinate—formal or informal—across the cases, the results of those efforts to date illustrate why a consolidation order from the Panel is necessary. In the Northern District alone, the parties initially agreed to consolidate the existing cases, all of which named Accellion, until several plaintiffs pulled out of the agreement after a consolidation stipulation had been agreed to in principle. Since that time, the parties have been negotiating a stipulation to extend Accellion's deadline to respond to the existing complaints while consolidation proceedings are pending, but wordsmithing the precise terms of plaintiffs' agreement has taken multiple rounds, each of which requires sign-off for counsel in 11 different cases. These difficulties will only be amplified when attempting informal coordination across multiple district courts, all on different schedules, and with no common voice to resolve disputes.

In addition, the Northern District of California is the district where the largest number of related actions are pending, including the first-filed federal action, and the only district where all defendants—Accellion, Kroger, and Flagstar—are already named in at least one action pending in the district.  Each of those cases is already before Judge Davila. The Panel routinely transfers cases to the forum where the first action was filed and where the largest number of actions are pending. *See, e.g.*, *In re Jamster Mktg. Litig.*, 427 F. Supp. 2d 1366, 1368 (J.P.M.L. 2006) (transferring actions the forum which "already hosts two of the three constituent actions (including the first filed action)"); *In re Publ'n Paper Antitrust Litig.*, 346 F. Supp. 2d 1370, 1372 (J.P.M.L. 2004) (transferring actions to district with "the largest number of pending actions"); *In re U.S. Foodservice, Inc. Pricing Litig.*, 528 F. Supp. 2d 1370, 1371 (J.P.M.L. 2007) (transferring case to forum where first action was filed); *In re Elevator & Escalator Antitrust Litig.*, 350 F. Supp. 2d 1351, 1353 (J.P.M.L. 2004) (transferring actions to district where first-filed and largest number of actions were pending). The first of the related actions was filed in in the Northern District of California on February 17, 2021, and four additional actions were filed in that district before a single complaint was filed in any other federal court.

As the Panel has acknowledged in numerous prior MDL proceedings, the Northern District of California is a convenient location that is well equipped with the resources and expertise to handle complex multidistrict litigation.  *See, e.g.*, *In re: Roundup Prods. Liab. Litig.*, 214 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016) (selecting the Northern District of California because it is "convenient and easily accessible for all parties" and the "district has the necessary judicial resources and expertise to efficiently manage this litigation"); *In re Yosemite Nat'l Park Hantavirus Litig.*, 24 F. Supp. 3d 1370, 1371 (J.P.M.L. 2014) (finding the Northern District of California to be "an accessible and convenient forum . . . for parties located across the country"). And since Accellion is headquartered within the district, the majority of Accellion personnel who may

16

be potential witnesses are located there, and it is otherwise a convenient and accessible forum for the parties and their witnesses.[4]

Accellion likewise agrees that Judge Davila is the most appropriate transferee judge. Aside from the fact that he is already presiding over most of the cases,[5] he is an experienced, well-respected jurist who has served as a judge in the Northern District of California for more than a decade and has substantial experience presiding over complex multidistrict litigations.

## V.    CONCLUSION

For all the foregoing reasons, Accellion respectfully requests that the Panel transfer all cases identified in the attached Schedule of Actions, as well as all subsequently filed tag-along actions, to the United States District Court for the Northern District of California for consolidated pretrial proceedings before the Honorable Edward J. Davila.

Dated:  April 22, 2021                    Respectfully submitted,

                                          /s/ Michael H. Rubin
                                          **LATHAM & WATKINS LLP**
                                          Michael H. Rubin (CA Bar No. 214636)
                                           Michael.rubin@lw.com
                                          505 Montgomery Street, Suite 2000
                                          San Francisco, California 94111-6538
                                          Telephone: +1.415.391.0600
                                          Facsimile: +1.415.395.8905

                                          *Attorney for Defendant Accellion, Inc.*

---

[4]    As the courts and counsel know from litigation over the past pandemic year, technology can be used to reduce or eliminate any inconvenience to individuals who are not located in California.

[5]    In addition, it is expected that other judges in the district will transfer any later-filed action to Judge Davila pursuant to the low-number transfer rule of the Northern District of California. *See* Local Rule 3-12(c) (providing for *sua sponte* judicial referral of any suspected related case to the judge assigned to the lowest-numbered case to consider whether the cases are related).